UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 15-22366-Civ-COOKE/TORRES

CAPITAL TELECOM ACQUISITION,
LLC, a Delaware limited liability company,

    Plaintiff,
v.

MIAMI-DADE COUNTY, a
political subdivision of the
State of Florida,

    Defendant.

_____/

## OMNIBUS ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

THIS MATTER is before me upon Plaintiff Capital Telecom Acquisition, LLC's Motion for Summary Judgment ("Capital Telecom's Motion") (ECF No. 45) and Defendant Miami-Dade County's Consolidated Motion for Summary Judgment and Response in Opposition to Plaintiff's Motion for Summary Judgment ("County's Motion") (ECF No. 51). Capital Telecom filed its Response in Opposition to the County's Motion (ECF No. 55) and both Parties filed their Statements of Material Facts (ECF Nos. 46,[1] 52). The matter is now ripe for review. I have reviewed the Parties' filings, the record, and the relevant legal authorities. For the reasons discussed below, Capital Telecom's Motion (ECF No. 45) is **GRANTED in part and DENIED in part**, and the County's Motion (ECF No. 51) is **GRANTED in part and DENIED in part**.

### I.    Background

This case involves the application of the Telecommunications Act of 1996 (TCA), 47 U.S.C. § 332(c)(7)(A), to the decisions of a Miami-Dade County zoning board to deny two separate applications to build a cellular telephone service tower. Plaintiff Capital Telecom

---

[1] While Capital Telecom did not fully comply with Local Rule 56.1(a)(d) by specifically supporting its statements of fact with citations to the over 700-page record, the Parties agree that no issues of material fact remain for trial. *See* Joint Pre-Trial Stipulation, ECF No. 58, ¶6.

Acquisition, LLC ("Capital Telecom") is a Delaware limited liability company that constructs, owns, and manages wireless telecommunications facilities, colloquially known as cellular phone towers. ECF No. 46, ¶1[2]. Capital Telecom contracts with national and regional wireless carriers to allow them to use its facilities to provide Personal Communications Services. *Id.* T-Mobile is one such national wireless service carrier. *Id.* at ¶2. Based on research and analysis by its radio frequency ("RF") engineers, T-Mobile believes it has a "significant gap" in coverage in the area of Miami-Dade County described as "NW 87th Ave from NW 166th Terrace in the south to NW 179th Lane in the north and along NW 174th Street from approximately I-75 in the west to NW 83rd Ave in the east ("Coverage Area"). *Id.* at ¶3. The County denies that any gap in coverage reaches the level of "significant" as the term is used in the context of the TCA. ECF No. 50, ¶3. T-Mobile asserts the gap cannot be remedied by upgrading or expanding its existing cellular phone towers in nearby areas because the distance from the existing towers to the cell phone users in the Coverage Area is too great. R., 367. T-Mobile approached Capital Telecom and requested Capital Telecom identify a suitable site and construct a wireless communications facility within the Coverage Area to remedy its professed gap in coverage. ECF No. 46, ¶6. Capital Telecom then evaluated properties within the search area to locate a property that would comply with local zoning standards and also meet T-Mobile's needs. *Id.* at ¶7.

After some research, Capital Telecom concluded that the property at 17200 NW 87th Avenue ("Subject Property") best fit T-Mobile's requirements. *Id.* at ¶8. The Subject Property is owned by Iglesia Bautista Nuevo Amanecer, Inc. and houses an existing church. *Id.* ¶9–10. The Subject Property is zoned as an Agricultural District ("AU"), which allows for the construction of a wireless supported service facility up to two hundred feet in height pursuant to Section 3.63.2(c)(2)(B)2.b of the Miami-Dade Land Development Code ("County Code") upon approval of an Unusual Use request in accordance with Sections 33-13 and 33-311(A) of the County Code. *Id*. at ¶10–11. The area surrounding the 5.3-acre Subject Property is almost exclusively single-family residential homes, except for a nearby charter school on the north border, which is located on residentially zoned property. R., 2, 97.

---

[2] References to the administrative record (ECF No. 44) are referred to with "R" and the page number on the bottom right corner of the page. All other references to the record are referred to by ECF number.

In Miami-Dade County, Community Zoning Appeals Boards ("CZABs") are the governmental organizations that make decisions on land use applications under the County Code. ECF No. 52, ¶1; *See* County Code §§ 33-306 and 33-311(A). Specifically, CZABs decide whether to grant or deny unusual use permits, including unusual uses to construct a wireless supported service facilities. *See id.* County staff review applications prior to public hearings and make a recommendation to the CZAB, although it is the CZAB that makes the ultimate decision on the application. *Id.*

**A. First Application**

On September 16, 2014, Plaintiff submitted an application ("First Application") to the County for

> approval of an Unusual Use to locate a camouflaged Antenna Support Structure on the subject Property one hundred feet (100') in height with the associated 45' x 55' equipment compound. The top of the unipole measures one hundred feet (100') AGL and is designed as a unipole with up to four (4) potential wireless provider RAD slots with wholly concealed antennas . . . . [D]ue to the residential character of the surrounding area, the Applicant proposes a camouflaged facility with wholly concealed antennas at fifty percent of the permitted height.

*Id.* at p. 3. The First Application established, and there is no dispute, that the proposed facility met all of the setback, height, and landscaping performance criteria set forth in Section 33-63.2 of the County Code. ECF No. 46, ¶18. On January 20, 2015, T-Mobile Engineering & Operations prepared an RF Engineering Review and submitted it to the County. R., 250. T-Mobile explained in its Review that "users may experience slow download times, interference, garbled conversations and drop calls among other symptoms due to the strain on network capacity." R., 250–51. The Review also included technical data, including "dBm" signal levels. R., 252. In February 2015, County staff suggested Capital Telecom consider two alternative locations to construct its facility. ECF No. 46-1, 87:24–88:19. In response, Capital Telecom submitted to the County additional information as to why it thought neither alternative site would work. R., 256.

The County staff's first recommendation was to deny without prejudice the unusual use permit.[3] R., 173–75. The staff noted in their recommendation that they had not seen any

---

[3] While there were other requests discussed on the County's staff's recommendation report, the only one relevant to this case is Request 1 for approval of the Unusual Use to build the cell phone tower.

3

technical data to determine the validity of a coverage gap, but ultimately found that a "100' high monopole tower, which abuts existing single-family residential development, would be visually intrusive and incompatible with the surrounding residential developments located to the south, east and west." *Id.* at 175.

A hearing before the CZAB was held on April 16, 2015. *See generally* ECF No. 49-1. At the hearing, seven members of the public presented their views on the First Application. *See generally id.* Some individuals spoke in favor of the application, one saying her children at the charter school had "terrible" service and could not make calls in the buildings. *Id.* at 29:21–30:13. Others spoke against the tower, and referred to the County staff's recommendation of denial as evidence of the visual impact the tower would have on the neighborhood. *Id.* at 33:17-34:1, 45:13-24 ("If the County says it is an eyesore, I believe it is going to be an eyesore."). One resident was concerned about the detrimental effect of the tower on property values in the area. *Id.* at 50:9-12. A member of the CZAB asked T-Mobile's engineer for more specific information about the number of customers affected by T-Mobile's coverage deficiencies; however, T-Mobile declined to provide specific customer data, protecting it as proprietary. *See id.* at 82:23–83:3. A CZAB member also inquired whether T-Mobile could address perceived indoor-service inadequacies through other means, such as supporting indoor calls via WiFi. *Id.* at 83:7–19. T-Mobile's engineer stated WiFi was a "very good solution," although not perfect. *Id.* at 83:20–25. During the hearing, some confusion arose as to whether Capital Telecom was presenting new technical data to the CZAB at the hearing that had not been reviewed by County staff prior to making their recommendation. *Id.* at 69:1-73:25. As a result, the CZAB decided not to rule on the application and deferred the decision until the next public hearing on May 14, 2015, to make sure the County staff was able to review the technical data. *Id.* at 94:3–97:12.

In the interim, T-Mobile prepared a Consolidated Technical Review Report dated April 22, 2015, which was delivered to County staff. R., 363-76. On May 6, 2015, Radio Communications Services Division (RCSD)–Information Technology Department (ITD) issued a memo to the Zoning Evaluation Section of the DERM addressing the two alternate locations proposed for the cell tower. R., 105. Alternate Location #1 was determined to be too close to another T-Mobile tower site "and would not provide the RF coverage and quality of service T-Mobile" sought. *Id.* However, County staff recommended T-Mobile give

further consideration to Alternate Location #2. *Id.* T-Mobile then submitted a Detailed Coverage Metrics Report on May 11, 2015, to address why it felt Alternate Location #2 could not meet its needs. R*.,* 269–71. On May 14, 2015, the RCSD–ITD issued a second memo to the Department of Regulatory and Economic Resources, explaining that based on the additional information provided by T-Mobile, Alternate Location #2 was not suitable to meet the RF coverage required by T-Mobile. R., 85.

However, the County staff's May 14, 2015 recommendation to the CZAB was again to deny without prejudice the request for Unusual Use. R., 95. Staff opined "that approval of the 100' high monopole antenna and the existing accessory structure may have negative visual impact on the surrounding residences in the area." R., 97. While the County staff determined "the requested tower use . . . [is] consistent with the [Comprehensive Development Master Plan], Low Density Residential designation of the property on the [Land Use Plan] map, subject to the application satisfying the compatibility criteria set forth in Policy LU-4A of the Land Use Element interpretive text," staff further opined that approval of the request would be incompatible with the surrounding area. R., 98–98. Staff pointed to the tower being "taller than any structure in the immediate surrounding area, specifically, the one-story single-family residences that abut the parcel to the south, east and west, and would be too excessive and would be visually intrusive to same." *Id.* Staff reviewed T-Mobile's documents related to T-Mobile's wireless coverage and capacity in the Coverage Area, but determined that there might be an alternative location which would be able to maintain signal strength in the area, specifically a location in Miami Lakes Park in the Town of Miami Lakes. R., 98–99. Staff suggested there might be other more suitable sites for the monopole tower, but did not specify where. R., 99. Staff again concluded that the tower would be "visually intrusive and incompatible with the surrounding residential developments located to the south, east and west." *Id.*

At the May 14, 2015 hearing, Capital Telecom again presented on the First Application, why it felt there was a need for the tower, and why the tower could not be placed elsewhere[4] and should be constructed on the Subject Property. *See generally* ECF No. 49-2. Capital Telecom supplied information about a nearby residential neighborhood that

---

[4] The additional site in Miami Lakes suggested by County staff was determined not to be a viable option because of the way the property was zoned. ECF No. 49-2, 8:4–13.

5

had been built up around an existing wireless facility constructed as a lattice tower, a taller tower with visible antennae and dishes, as evidence that a tower and residential neighborhoods could be compatible. *Id.* at 49-2, 21:14–22:14. Two members of the public testified in response that those homes were still worth less than homes in surrounding neighborhoods further from the tower. *Id.* at 24:15–21; 38:16–39:6, 40:21–25. Overall, five speakers spoke on behalf of the tower, and six speakers spoke in opposition. *Id.* at 24–47. Many of the concerns were the same as those expressed at the April 16, 2015 hearing, namely visual impact and property values. The CZAB councilmembers again questioned T-Mobile about customer data and WiFi as an alternative coverage mechanism, receiving the same answers as at the prior hearing. *Id.* at 66:13–67:20; 57:13–17. At the termination of the hearing, the CZAB voted to follow the staff's recommendations and deny without prejudice Capital Telecom's unusual use request. *Id.* at 78:21–79:19. The CZAB formalized its decision in writing via Resolution No. CZAB5-4-15 ("First Denial"). R., 227–49. The First Denial stated "the requested UNUSUAL USE to permit a 100' high wireless supported service facility and ancillary equipment would not be compatible with the area and its development and would not conform with the requirements and intent of the Zoning Procedure Ordinance, and that the requested UNUSUAL USE (Item #1) would have an adverse impact upon the public interest and should be denied without prejudice." R., 228. The First Denial further stated that the permit request was denied without prejudice "as per the recommendation of the Miami-Dade County Department of Regulatory and Economic Resources" and incorporated the May 14, 2015 Staff Recommendation as Exhibit A. R., 230, 232–47. The First Denial was sent to Capital Telecom in writing on May 26, 2015. R., 248.

Capital Telecom then filed the instant lawsuit on June 24, 2015, alleging that the First Denial violated the TCA. *See* ECF No. 1, R., 564–600. The Parties attended mediation on November 15, 2015. At the mediation, the Parties agreed on a framework for resolving Staff's concerns, which included Capital Telecom modifying the landscaping component of its application to conceal the 100' tower better from the surrounding residential area. ECF No. 52, ¶22; *see* ECF No. 25.

**B. Second Application**

On February 15, 2016, Capital Telecom filed its Second Application with the

6

County. R., 601–50. The only difference between the First Application and the Second Application was the landscaping plan. R., 602. In the First Application, Capital Telecom had proposed surrounding the New Dawn Church site to the north, south, and west property lines with royal palm trees. R. 682. In the Second Application, Capital Telecom proposed planting twenty-five live oak trees that would grow to a maximum height between 60 feet and 80 feet. *Id.* This time around, County staff recommended approval of the application with certain conditions. R., 681. The conditions related mostly to complying with the landscaping plan as proposed in the application. *See* R., 684. Zoning staff opined that "the taller trees on the subject site will reduce the negative visual impacts generated by the monopole tower on the neighboring residences in the surrounding area." *Id.* No additional suggestions were made regarding alternate locations for the proposed tower.

A public hearing on the Second Application took place on April 14, 2016 before the CZAB. *See generally* ECF No. 49-3. Capital Telecom made a full presentation on its Second Application, not just the landscaping requirements. *See generally id.* Nine citizens spoke at the hearing, two in favor of the tower and seven opposed. *See generally id.* Some of the citizens had attended the previous hearings. As with the previous two hearings, the opposition to the tower related primarily to visual impact and property values. For example, one resident stated "the residential area and commercial areas . . ., they usually don't mix too good. And to have a residential area with a commercial tower making money, they usually go in a commercial area." *Id.*, 39:25–40:4. The citizen admitted he had not been able to see a picture of the tower, but stated, "[W]e just don't want a tower." *Id.* at 40:4. A subsequent speaker asked, "[I]f this was going to be built in your backyard, would you allow it? Would you want it?" *Id.* at 49:24–50:1. One resident was doubtful of the changes Capital Telecom had made to the application, stating "[we] know for a fact that nothing has changed from the last time, nothing whatsoever." *Id.* at 26:10–12. After the hearing concluded, a CZAB member first made a motion to deny the application with prejudice. *Id.* at 68:4–69:2. The motion failed by a 3 to 2 vote. *Id.* The discussion afterward revolved around what constituted substantial competent evidence on which the CZAB could base its decision, before a motion was made and passed to deny the application without prejudice. *See* 69:7–73:14. The CZAB did not engage in a discussion on the merits of the application. *Id.*

7

The CZAB issued Resolution No. CZAB5-6-16 ("Second Denial") documenting its decision, which was sent to Capital Telecom on April 28, 2016. R., 783–86. The Second Denial found that Capital Telecom's request "would not be compatible with the area and its development and would not conform with the requirements and intent of the Zoning Procedure Ordinance." *Id.* at 783. It further stated the unusual use request "would have an adverse impact upon the public interest and should be denied without prejudice." *Id.*

## II. LEGAL STANDARD

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The existence of a factual dispute is not by itself sufficient grounds to defeat a motion for summary judgment; rather, "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986). A dispute is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States,* 516 F.3d 1235, 1243 (11th Cir. 2008) (citing *Anderson,* 477 U.S. at 247–48). A fact is material if "it would affect the outcome of the suit under the governing law." *Id.* (citing *Anderson,* 477 U.S. at 247–48). The Parties are in agreement that there are no genuine issues of material fact and that the record, including hearing transcripts, constitute a sufficient basis to grant or deny the Parties' motions as a matter of law. *See* Joint Pre-Trial Stipulation, ECF No. 58, ¶6. I agree.

## III. DISCUSSION

Capital Telecom argues in its Motion that the County violated the TCA in two ways: 1) the County did not base its First and Second Denials on substantial competent evidence (Counts I and III), and 2) the First and Second Denials constitute an effective prohibition on the provision of personal wireless services (Counts II and IV). Capital Telecom asks the Court to issue an injunction requiring the County to issue its permits. In response, the County asserts in its Motion that its First and Second Denials were founded on substantial competent evidence and that the denials do not amount to a prohibition, effective or otherwise, of personal wireless service. To fully understand the basis of the Parties' arguments, it is first helpful to review the statutory framework under which Capital Telecom brings its claims.

### A. Background of the TCA

Congress enacted the TCA to "deregulate[] various aspects of the wireless phone industry. . . .[It] was meant to promote competition and higher quality in American telecommunications services and 'to encourage the rapid deployment of new telecommunications technologies." *Michael Linet, Inc. v. Village of Wellington, Fla.*, 408 F.3d 757 (11th Cir. 2005) (quoting *City of Rancho Palos Verdes, CA. v. Abrams*, 544 U.S. 113, 115 (2005)). "The Act generally preserves 'the traditional authority of state and local governments to regulate the location, construction, and modification' of wireless communications facilities like cell phone towers, but imposes 'specific limitations' on that authority." *T-Mobile South, LLC v. City of Roswell, GA.*, 135 S.Ct. 808, 814 (2015) (quoting *Rancho Palos Verdes v. Abrams*, 5445 U.S. 113, 115 (2005)). One such limitation is that "[a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii). Another is that a local government cannot regulate "the placement, construction, and modification of personal wireless service facilities" in a way that "prohibit[s] or [has] the effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i)(II). A party who is "adversely affected by a locality's decision may seek judicial review." *T-Mobile South,* 135 S.Ct. at 814.

### B. Substantial Evidence

The power of federal courts to interfere in TCA-related zoning decisions is limited. *Am. Tower LP v. City of Huntsville*, 295 F.3d 1203, 1207 (11th Cir. 2002). In reviewing an agency's decision, a court is bound by "the traditional substantial evidence standard used by courts to review agency decisions." *Id.* at 1208; *see also T-Mobile South,* 135 S.Ct. at 815. The standard is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," often construed as "more than a mere scintilla but less than a preponderance." *Am. Tower*, 295 F.3d at 1207 (internal quotations omitted). Although the standard "is not as stringent as the preponderance of the evidence standard, it requires courts to take a harder look than when reviewing under the arbitrary and capricious standard." *Preferred Sites,* 296 F.3d at 1218.

"A blanket aesthetic objection does not constitute substantial evidence under [the TCA]." *Michael Linet*, 408 F.3d at 761. However, "[a]esthetic objections coupled with evidence of an adverse impact on property values or safety concerns can constitute substantial evidence." *Id.* "[T]he party seeking to overturn the local zoning board's decision has the burden of proving that the decision is not supported by substantial evidence." *Am. Tower*, 295 F.3d at 1207. "[A] court should view the record in its entirety, including evidence unfavorable to the state or government's decision." *Preferred Sites*, 296 F.3d at 1218. However, a court cannot displace the local government's fair estimate of conflicting evidence and cannot freely re-weigh the evidence. *Am. Tower*, 295 F.3d at 1209.

    a. **First Denial**

The CZAB's First Denial denied Capital Telecom's First Application because it would be incompatible with the surrounding area. R. 95. While the First Denial was rather conclusory, it explicitly relied upon and incorporated the County staff's recommendation in denying Capital Telecom's First Application. R., 227–49. The staff recommendation on the First Application was to deny the application without prejudice because the visual impact of the tower would make it incompatible with the surrounding residential neighborhood. *See* R., 95–98. At the hearings, several citizens specifically cited to the staff's opinion that the tower would be visually intrusive to the neighboring community. ECF 49-1, 33:17–34:1, 45:13–24. In their recommendation, the staff did not disagree with T-Mobile's contention that it had a coverage gap or that the County's proposed alternate sites would not be viable alternatives. *See* R., 95–98; ECF 49-2, 6:19–25. Nevertheless, some CZAB members questioned T-Mobile's engineer regarding the number of customers affected by the alleged gap and the possibility of WiFi as an alternative. ECF No. 49-1, 82:23–83:3, 83:20–25; ECF No. 49-2, 66:13–67:20, 57:13–17. While it is not entirely clear that the CZAB attached any weight to the lack of customer data or the possibility of WiFi as an alternative to a tower, I find that the staff recommendation in conjunction with these specific CZAB concerns constitutes substantial competent evidence. T-Mobile may have supplied the County with substantial competent evidence to support approval of their application, but a reasonable mind could accept the staff's recommendations and possible alternatives as a basis for denying the First Application.

### b. Second Denial

There is no doubt that the First and Second Applications are very similar—they differ only in their landscaping plan. As with the First Application, there is no dispute that the Second Application met all met all of the setback, height, and landscaping performance criteria set forth in Section 33-63.2 of the County Code. The reasoning behind the CZAB's decision in the First and Second Denials also appears to be similar. However, while the First Denial was supported by substantial competent evidence, the Second Denial was not. In voting on the Second Denial, the members of the CZAB engaged in no discussion of the merits of the Second Application, nor did they express their specific concerns about the application. ECF No. 49-3, 69:7–73:14. The Second Denial simply contained conclusory statements that the tower would not be compatible with the area, would not conform with zoning requirements, and would have an adverse impact on the public interest. R., 783. It did not rely on the staff's recommendation, nor did it give any indication on how it came to its conclusions. While a court must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974), "courts must [still] be able to identify the reason or reasons why the locality denied the application" to determine whether the denial was based on substantial evidence. *T-Mobile South*, 135 S.Ct. at 814. "In short, . . . localities must provide reasons when they deny cell phone tower siting applications. . . . [T]hese reasons need not be elaborate or even sophisticated, but rather, . . . simply clear enough to enable judicial review." *Id.*, 135 S.Ct. at 811–12. In the Second Denial, the only basis I can reasonably discern for the CZAB's decision is the public's generalized concerns about the aesthetics of the proposed facility and their worry about adverse effects on their property values. Unfortunately, generalized opposition to a tower does not constitute substantial evidence upon which to deny an application to construct a wireless facility. *See Riverside Roof Truss, Inc. v. Bd. of Zoning Appeals of City of Palatka*, 734 So. 2d 1139, 1142 (Fla. Dist. Ct. App. 1999); *AT&T Wireless Services v. Orange County*, 982 F.Supp. 856, 860 (M.D. Fla. 1997).

At the public hearing on the Second Application, many residents expressed their concerns about the visual impact of the proposed tower and the possible negative effects on their property values. For example, many citizen speakers felt it was simply wrong for a wireless services facility to be placed near a residential community. One citizen refused to

acknowledge that the Second Application was any different from the first, ECF 49-3, 26:10–12, despite picture simulations from Capital Telecom showing that mature live oak trees would virtually eliminate any view of the tower from the surrounding boundaries. R., 705–12. Another speaker who spoke against the visual impact of the tower stated he had not been able to see a picture of the proposed tower. ECF No 49-3, 40:4. Only one citizen drew a direct relation to the actual proposed tower and the neighborhood to which it was to be placed, and his testimony was still generalized: "I think that everyone sitting behind me is an expert in this neighborhood and they would all tell you that this tower just doesn't fit in the community." ECF No. 49-3, 43:15–17. In examining another case with similar neighbor concerns, there is a stark contrast to the evidence of visual impact presented there and the evidence provided in the instant case. *See Michael Linet, Inc. v. Vill. of Wellington*, 2004 WL 5565012, at *5 (S.D. Fla. Apr. 27, 2004). In *Village of Wellington*, a balloon test had been conducted where a balloon was floated at the height of the proposed tower to ascertain the tower's visibility from the surrounding area. *Id.* Many of the testifying citizens had seen the balloon to fortify their claim of an adverse visual impact. *Id.* In the case at bar, no one testified that the tower would disrupt the view from their driveway or backyard; the testimony provided was simply unsubstantiated testimony that the tower would be an eyesore and no landscaping would mitigate the visual impact of the tower. I cannot find that such statements were based upon facts, and therefore they cannot constitute substantial evidence. "[T]he neighbor testimony, while sincere, was largely opinion based and, therefore, lacked sufficient factual content to support the [CZAB's] decision." *Benjamina Nursery Farm, Inc. v. Miami-Dade Co.*, 170 F. Supp. 2d 1246, 1253 (S.D. Fla. 2001).

"Also relevant is whether the company can reasonably place a cell site in an alternative location and eliminate the residents' concerns." *Michael Linet*, 408 F.3d at 762. Nowhere in the record for the Second Application is there a mention of alternate locations for the tower or possible alternatives, such as WiFi. To the extent the CZAB *may* have relied on the brief discussion of alternatives at the hearings for the First Application, that alone would not constitute substantial competent evidence.

The County next claims that the CZAB based its decision on the negative impact the tower may have on property values. Several citizen speakers at the hearing spoke about the tower impacting property values, including one who compared the proposed tower to the

"eyesore of a tower" in Miami Lakes (ECF No. 49-3, 30:24–2), a different type of tower than the one being proposed in the Second Application. R., 136–52, 356–62. Another stated, "[B]ut I imagine if I have a big tower that I have to look at, I imagine a couple of people wouldn't want my house." ECF No. 49-3, 39:19–24. The County points to *Michael Linet* to support its contention that lay testimony from residents and a realtor as to property values is acceptable. *Michael Linet*, 408 F.3f at 762. I do not disagree. However, while many citizens testified before the CZAB at the April 2016 hearing, the citizen testimony amounted to speculation and no realtor testimony was presented. The Eleventh Circuit has accepted "that residential districts can exist in which a tower would not impact on property values significantly. So, significant negative impact on property values is not inherent with towers in residential districts." *Am. Tower*, 295 F.3d at 1209 n.7. The CZAB would need more than assumptions to constitute substantial competent evidence.

The County has put forward several other reasons for the Second Denial; however, those reasons do not appear to have been considered in forming the Second Denial. A local government "may not rely on rationalizations constructed after the fact to support the denial" of an application to build a wireless communications facility. *Preferred Sites*, 296 F.3d at 1220 n.9. The County states in its Motion that the evidence Capital Telecom presented to the CZAB in its application "failed to establish the additional requirements under § 33-311(A)(3)(a)(i)(a)–(b)—that the proposed tower would cure signal interference problems or cure the applicant's lack of wireless coverage or capacity in the area intended to be served by the proposed tower." ECF No. 51, p. 8. The County more fully details it criticisms of T-Mobile's claim of "lack of wireless coverage or capacity" in its Statement of Undisputed Material Facts (ECF No. 52, p. 5), including picking apart the maps provided by T-Mobile; however, there is no indication that the CZAB considered these arguments as they related to the Second Application or based its Second Denial on them. The only fact-based testimony at the hearing regarding wireless coverage that could have rebutted T-Mobile's claims and the staff's confirmation of those claims was that of two citizens. One stated she had T-Mobile service and her children at the school could not get in-building coverage. ECF 49-3, 23:8–11. The other person stated his service was fine, but conceded the service at the school was fine because "the school system phone works." ECF 49-3, 40:18–23. This testimony actually confirms that in-building coverage is poor, even if there is

dispute among citizens about the necessity for coverage specifically within school buildings. It is true the CZAB is not bound by staff recommendations; however, the CZAB still needs more than "a mere scintilla" of factual evidence on which to base its opinion. A mere scintilla is all that is present here. Even if the County's arguments were valid as to T-Mobile's lack of actual need for the tower or the inadequacy of T-Mobile's supporting technical data, and I do not address that here, these justifications cannot be supplied in a post-hoc fashion after the CZAB has issued its decision.

### C. Effective Prohibition

Capital Telecom also argues that both the First and Second Denials constituted an "effective prohibition" in violation of the TCA. The TCA limits local governments from regulating "the placement, construction, and modification of personal wireless service facilities" in a way that "prohibit[s] or [has] the effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i)(II). "'Unlike the substantial evidence issue, the issue of whether [a local government] has prohibited or effectively prohibited the provision of wireless services is determined de novo by the district court'" without deference to the local government's decision. *PI Telecom Infrastructure, LLC v. City of Jacksonville, FL*, 104 F. Supp. 3d 1321, 1346 (M.D. Fla. 2015) (quoting *T–Mobile Ne. LLC v. Loudoun Cnty. Bd. of Supervisors,* 748 F.3d 185, 192 (4th Cir.2014)). However, what exactly constitutes an "effective prohibition" has not been clearly established in the Eleventh Circuit. *Id.* Because I find that the County inappropriately denied Capital Telecom's Second Application, the First Denial could not have been an effective prohibition. I do not address whether a denial of the Second Application would have amounted to an effective prohibition under the TCA.

### D. Remedy

Capital Telecom requests an injunction requiring the County to issue the Unusual Use Permits at issue. The County does not dispute that an injunction is an appropriate remedy, while not conceding an injunction is warranted in this instance. Although the TCA itself does not specify the appropriate relief when a local government violates the TCA, the Eleventh Circuit has held "an injunction ordering issuance of a permit is an appropriate remedy" when denial of a request to build a permit was not based on substantial evidence. *Preferred Sites*, 269 F.3d at 1221. I find that an injunction is appropriate here, where the County did not base its Second Denial on substantial competent evidence.

### E. Attorney's Fees

In the County's Motion, it argues that Capital Telecom is not entitled to attorney's fees as requested in Capital Telecom's Second Amended Complaint (ECF No. 36). Capital Telecom does not address this argument in its response, likely because the law is not on its side. In *City of Rancho Palos Verdes*, the Supreme Court specified that the "remedies available [under the TCA] perhaps do not include compensatory damages . . . and certainly do not include attorney's fees and costs." *City of Rancho Palos Verdes, Cal. v. Abrams*, 544 U.S. 113, 122–23 (2005). I therefore find that Capital Telecom is not entitled to attorney's fees and costs.

### IV. Conclusion

Having reviewed the arguments and the record, there exist no genuine disputes as to any material facts for determination at trial. It is clear that, as a matter of law, the County violated the TCA only when it denied Capital Telecom's Second Application without substantial competent evidence on which to base its decision.

Accordingly, it is **ORDERED and ADJUDGED** as follows:

1. Plaintiff Capital Telecom's Motion (ECF No. 45) is **GRANTED** as to Count III and **DENIED** as to Counts I, II, and IV.
2. Defendant Miami-Dade County's Motion (ECF No. 51) is **GRANTED** as to Counts I, II, and IV, and **DENIED** as to Count II.
3. The County shall issue the unusual use permit in accordance with the conditions set forth in the staff recommendation dated April 14, 2016.
4. The Clerk is directed to **CLOSE** this case. A separate judgment pursuant to Rule 58 of the Federal Rules of Civil Procedure shall issue concurrently.

**DONE and ORDERED** in Chambers, in Miami, Florida, this 30th day of June 2017.

*/s/ Marcia G. Cooke*
MARCIA G. COOKE
United States District Judge

Copies furnished to:
*Edwin G. Torres, U.S. Magistrate Judge*
*Counsel of record*